UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BRANDY PENA, DAEREON FRIDAY, SHAUKAT ALI,
ARIFUL ISLAM, individually and on behalf of all others
similarly situated,

                                         Plaintiffs,

                  -against-

THE CITY OF NEW YORK, DAVID DO, Chair of the
NYC Taxi and Limousine Commission, SHERRYL
ELUTO, Deputy Commissioner the NYC Taxi and
Limousine Commission, and MOHAMMED
AKINLOLU, Associate Commissioner for Prosecution for
the NYC Taxi and Limousine Commission,

                                        Defendants.

-------------------------------------------------------------------X

**24-CV-5893 (___)**

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Brandy Pena, Daereon Friday, Shaukat Ali and Ariful Islam, individually and on behalf of all others similarly situated, by their attorney, Daniel L. Ackman, as and for their complaint, allege as follows:

## NATURE OF THE ACTION

1.      The City of New York, acting through its Taxi and Limousine Commission (TLC) maintains a policy of summarily suspending the license of any taxi or for-hire vehicle driver who is arrested (not convicted, just arrested) on criminal charges, including any felony charge or one of 19 misdemeanor charges.

2.      The TLC enforces this *de facto* policy routinely and by rote, without regard for the driver's record (either as a citizen or as a taxi driver), without interviewing the driver, the

1

complainant or the arresting officer, and without regard for the context of the allegation that led to the arrest.

3.    The TLC does so even though there in no statute or TLC rule that permits a driver's license suspension based on an arrest alone. Instead, TLC rules provide that the TLC Chair "can summarily suspend a [taxi driver's] License if the Chairperson believes that continued licensure would constitute a direct and substantial threat to public health or safety, pending revocation proceedings." 35 RCNY § 68-15(a)(1). The same rule adds: "The Chairperson can summarily suspend a License based upon criminal charges pending against a Licensee if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety. Such charges include but are not limited to" [any felony] or a list of 19 separate misdemeanors. 35 RCNY § 68-15(d)(1).

4.    In fact, the TLC, acting through an inferior officer, not the Chair, suspends drivers upon notice of one of the criminal charges listed in Rule 68-15(d)(1) without the Chair (or any TLC officer) forming a belief that the driver's continued licensure would constitute a direct and substantial threat to public health or safety and without considering facts or evidence that would allow for such a belief.

5.    Only after the summary suspension does the TLC offer the driver a hearing to determine whether the suspension should be lifted or extended for as long as the criminal are pending.

6.    The summary suspension hearings are administrative proceedings that begin with a Notice of Hearing and Petition and end with a report and recommendation by a City administrative law judge and a final decision by the TLC Chair. For the TLC to prevail, it is not

enough for the TLC to show that the driver was arrested or that a charge is pending. Instead, the TLC must prove by a preponderance of evidence that the driver's continued licensure poses a direct and substantial threat to public health or safety (or, more specifically, that the Chair believes that to be the case). 35 RCNY § 68-15(d)(5).

7.      The constitutionality of the TLC practice summary suspension practice and its post-suspension hearing practice, which had been in effect at least since 2003 has been discussed in numerous district court decisions and in several Second Circuit Court of Appeals decisions, most prominently in *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) and *Nnebe v. Daus*, 931 F.3d 66 (2d Cir. 2019). The Court of Appeals decisions held in its decisions that the TLC was, in contrast to the general rule, constitutionally permitted to suspend a driver's license based on arrest without a hearing of any kind, but that its post-suspension hearings systemically denied drivers constitutional rights to due process of law.

8.      While the Court of Appeals held that suspensions without hearings were not unconstitutional *per se*, it did not say that a suspension could be lawful based on an arrest alone, disregarding other factors or that the Chair was not required to believe that the driver's licensure posed a direct and substantial threat to public safety in order to suspend or to extend a suspension after a hearing.

9.      In practice, the TLC Chair (or an inferior officer) orders suspensions and orders the extension of suspensions without forming any belief that the driver poses a direct and substantial threat to public safety. The TLC routinely does so without conducting any relevant investigation and without obtaining or considering any pertinent data or evidence.

10.     Indeed, the TLC does not even consider information in its own files or information readily available to from the New York City Police Department (NYPD) to the question of whether the driver's licensure poses a direct and substantial threat to public safety.

11.     Plaintiffs here  have prevailed in their post-suspension hearings— as do a large majority of all drivers in such hearings— despite the practice at those hearings requiring the ALJ to "presume[] [the charges are] true" and despite procedural rules allowing the TLC to rely on hearsay, which it, in fact, does in every case.

12.     The TLC's current prosecution of its petitions are malicious in that the TLC in practically all cases commences and prosecutes the judicial proceeding against the driver without probable cause that the driver's licensure poses a direct and substantial threat to public health or safety, and that it prosecutes post-suspension hearings without seeking or obtaining relevant evidence. In all cases where the individual plaintiffs here were respondents, the proceedings were nevertheless terminated in favor of the plaintiffs, causing injury to plaintiffs.

## JURISDICTION AND VENUE

13.      This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, under the New York State Constitution, Article 1, § 12, and under New York common law

14.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367, 2201.

15.     The acts complained of occurred in part the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

16.     Plaintiffs demand trial by jury in this action.

## PARTIES

17.    Defendant City of New York is a municipality of the state of New York, which includes the TLC as an administrative agency. The TLC's headquarters is in New York County.

18.    Defendant David Do is chairperson of the Taxi and Limousine Commission. He has overall responsibility for enforcing TLC policy.  He is responsible for implementing and overseeing the policies of the commission and for ensuring that TLC personnel obey the Constitution and laws of the United States and of the State of New York. He has authority to suspend and extend the suspensions of TLC licensees.

19.    Defendant Sherryl Eluto is General Counsel and Deputy Commissioner of the TLC, who often rules in suspension cases.

20.    Mohammed Akinlolu is the Associate Commissioner for Prosecution for the NYC Taxi and Limousine Commission, who generally signs petitions in TLC suspension-on-arrest cases.

21.    Plaintiff Brandy Pena is a TLC licensed driver whose license was suspended by the TLC purely due the fact that he was arrested on misdemeanor charges. He is a resident of Kings County.

22.    Plaintiff Daereon Friday is a TLC licensed driver whose license was suspended by the TLC purely due the fact that he was arrested on misdemeanor charges. He is a resident of Bronx County.

23.    Plaintiff Shaukat Ali is a TLC licensed driver whose license was suspended by the TLC purely due the fact that he was arrested on misdemeanor charges. He is a resident of Queens County.

24.    Plaintiff Ariful Islam is a TLC licensed driver whose license was suspended by the TLC purely due the fact that he was arrested on misdemeanor charges. He is a resident of Queens County.

## CLASS ACTION ALLEGATIONS

25.    The Plaintiff class seeks a declaration that the TLC policy of summarily suspending licenses without seeking or obtaining evidence that the driver's licensure poses a direct and substantial threat to public safety is unlawful.

26.    The Plaintiff class seeks compensatory and punitive damages.

27.    Plaintiffs sue on behalf of themselves and all other similarly situated individuals, and seek to represent pursuant to Rule 23 (a), Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

28.    The class period commences on the date three years prior to the date of the initial complaint in this case and extends to the date on which the defendants are enjoined from, or otherwise cease, enforcing their unconstitutional policies and practices. For the pendant state law claim the class period commences on the date one year prior to the date of the initial complaint

29.    The members of the class are so numerous as to render joinder impracticable. Upon information and belief, based on TLC public records, there are more than 50 drivers whose licenses have based solely on arrests and there will likely be many more in the same position while this action is pending. In addition, there are more than 41,000 yellow taxi drivers licensed by the TLC, all of whom are subject to the TLC's license suspension and revocation policies. The vast majority of New York City taxi drivers are foreign born, most from countries with no tradition of civil rights.

30.    Upon information and belief, joinder is impracticable given the number of absent class members and because many members of the class are low-income persons, many of whom

do not speak English well, and likely would have great difficulty in pursuing their rights individually.

31.    The questions of law and fact common to the class include whether the class members have common rights under the Fifth and Fourteenth Amendments to be free from unconstitutional license suspension and revocations.

32.    The named plaintiffs are adequate representative of the class. The violations of law alleged by the named plaintiffs stem from the same course of conduct by defendants, which violated and continue to violate the rights of members of the class; the legal theory under which the named plaintiffs seek relief is the same or similar to that on which the class will rely. In addition, the harm suffered by the named plaintiffs is typical of the harm suffered by absent class members.

33.    The named plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Counsel for the plaintiffs knows of no conflicts among members of the class.

34.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of hundreds of separate actions would be inefficient and wasteful of legal resources; (b) the members of the class may be scattered throughout New York City and State and are not likely to be able to vindicate and enforce their Constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications

with respect to individuals pursuing claims against defendants which would establish

incompatible standards of conduct for defendants; (f) defendants have acted and will act on

grounds applicable to all class members, making final declaratory and injunctive relief on behalf

of all members necessary and appropriate; and (g) questions of law and/or fact common to

members of the class especially on issues of liability predominate over any question, such as that

of individual damages, that affect individual members.

## FACTS

### THE TLC'S CURRENT HEARING PRACTICE

35.    Pursuant to current TLC rules, the TLC suspends and  effectively seizes any

driver's license who is arrested on any felony charge or on one of 19 commonly charged

misdemeanors. To be reinstated the driver must request a hearing, at which evidence and

testimony under oath is offered and considered and both the driver (referred to as the respondent)

and the TLC (referred to as the petitioner) have the right of cross-examination.

36.    The commission must schedule a hearing within ten business days of the driver's

request. But even after such a request, the commission undertakes no investigation of either the

driver's record or the criminal allegations. In fact, only after a hearing is scheduled does that

TLC even request from the NYPD a copy of the arrest report. Only after a hearing is scheduled

does the TLC obtain a copy of the criminal complaint— and often it does not obtain a copy of

the complaint at all.

37.    The TLC's examination of either the police report or the criminal complaint never

causes it to reconsider its position or to lift the driver's suspension.

38.    Even after a hearing is requested and scheduled, the TLC's practice is to never

interview the driver or his attorney, never speak to the arresting officer or officers, never reach

out to the assistant district attorney prosecuting the criminal case. Its practice is also to never even review the driver's record to see, for example whether the driver has any prior criminal convictions or arrests, whether his he has any serious TLC rule violations on his record whether his license has been suspended before, or whether he has a positive rating from the services that effectively employ him such as Uber or Lyft.

39.    Prior to the hearing, the TLC's practice is to hold a so-called conference, at which NYC judges different from the judges who will preside at the hearing or law clerks generally attempt to dissuade drivers from going forward with a hearing. The ALJs at these conferences note that the hearing decision will be a public record so that the fact the driver has been arrested and the arrest charges will be discoverable on the Internet even after the charges are dismissed and otherwise sealed.

40.    The driver may be represented by counsel at the hearing.

41.    At the hearing itself, the TLC's practice is to never call a witness. Instead it relies exclusively on so-called "documentary evidence," which means five, or perhaps, six documents, only one or two of which is even arguably evidence of the issue at hand. Those documents are: (1) a "Notice of Summary Suspension Hearing," which informs the driver of his hearing date and otherwise contains boilerplate on what the TLC must prove and what evidence the driver may present. The Notice of Summary Suspension Hearing also contains a "Petition," which is a pleading that states that the  TLC "seeks a determination that Respondent's continued licensure while awaiting a decision on the below criminal charges would pose a direct and substantial threat to the health or safety of the public," lists the pending charges,  and a boilerplate concluding sentence  stating, "Accordingly, Respondent's TLC license(s) should remain suspended, pursuant to TLC Rules 68-15(a)(1) and 68-15(d)." (2) a so-called TAMIS printout,

which contains the driver's name and address and codes that summarize his TLC record; (3) a "Directive and Notice of Arrest Suspension," which tells the driver that the TLC has received notice of his arrest and that he has the right to a hearing. It also informs the driver that the TLC "may also lift the suspension, possibly without a hearing, if you notify TLC that there has been a significant change in your criminal case, such as a dismissal or other favorable disposition of the above charge(s), or reduction of the charge(s) to a less serious offense;" (4) the NYPD Omniform arrest report, which states the arrest charges and also includes a "narrative," which is a brief description of the arrestee's alleged conduct, generally a sentence or two; (5) a New York State Webcrims document, which states the charges pending at time the document was created, that is just before the hearing; and, sometimes, (6) the criminal complaint, which states the charges and a brief narrative of the arrestee's alleged conduct, which is presented to the criminal court on the date of his arraignment.

42.    While the criminal complaint contains the sworn statement of a police officer, which summarizes the statement made by a complaining witness, none of these documents contain a sworn statement of any witness to the alleged crime.

43.    Apart from the Notice of Summary Suspension Hearing, the TAMIS printout, and the Directive and Notice of Suspension, which are generated by the TLC itself, the TLC never obtains any of these documents until after a driver requests a post-suspension hearing and indeed not until after a hearing is scheduled.

44.    At the hearing, the TLC relies primarily on the narrative from the police report. The suspended driver almost always testifies as to the alleged conduct that led to his arrest and to his record as a driver (such whether he has any prior license suspensions) and as a citizen (such as whether he has any prior arrests). While the TLC is aware of whether the driver has any prior

license suspensions or substantial TLC rule violations, it does not research the driver's criminal record or lack thereof.

45.    Even if the driver has no criminal record and no prior arrests (which the TLC would know before the hearing), no previous license suspensions, and presents sworn testimony as to evidence in mitigation relating to the incident leading to the arrest, the TLC *always* takes the position that the driver's license should remain suspended.

46.    The commission's practice is to maintain the driver's suspension while the administrative proceeding is pending, indeed until after an NYC administrative law judge assigned by the City's Office of Administrative Trials and Hearings (OATH) issues a written report and recommendation that the suspension be lifted and the TLC chair accepts that recommendation.

47.    Often, the TLC has no evidence—and even no real argument— that the driver's licensure poses a direct and substantial threat to public safety. But it still invariably takes the position that the driver should remain suspended based on the arrest alone. The TLC takes this position even if the charge is a misdemeanor and the driver has never been arrested before.

48.    The OATH ALJ may sustain the petition only if the charge is supported by a preponderance of the evidence adduced. The ALJ generally takes 10 business days to issue a report and recommendation to the TLC Chair.

## RESULTS OF TLC SUMMARY SUSPENSION HEARINGS

49.    TLC post-suspension hearings are adjudicated by administrative law judges (ALJs) employed OATH.

50.    Not surprisingly given the TLC's practice of refusing to investigate the driver's record or the circumstances of the underlying criminal charge, OATH judges have been ruling

against the TLC at an increasingly high rate. More specifically, since July 2023, OATH judges have ruled in the driver's favor (that is recommending their reinstatement) in 52 cases compared to 10 cases where they ruled in favor of the TLC. In other words, City judges favored the driver 84% of the time.

51.     The driver's win-rate is even higher for cases prompted by misdemeanor arrests. In misdemeanor-based cases, OATH ALJs ruled for the driver 40 out of 44 cases or 91% of the time. (Even where the driver was charged with a felony, they prevailed in 71% of cases.) And in the past six months (starting from January 25, 2024), drivers have prevailed at 25 out of 28 hearings or 89% of the time.

52.     Despite this history, the TLC persists in its practice of suspending drivers based solely on arrests and on prosecuting the hearings without ever engaging in any meaningful investigation of the charges or the driver's record.

53.     Even in cases where taxi drivers are arrested and suspended, but do not request a post-suspension hearings, convictions are rare and the vast majority of arrest charges are ultimately dismissed.[1]

### PLAINTIFFS' CASES AND RESULTS

### Brandy Pena

54.     The TLC suspended Brandy Pena's license on April 4, 2024 after being notified that he was arrested on or about April 1, 2024 for assault in the third degree and criminal

---

[1] Despite the TLC rule name suggesting that suspensions on arrests are preludes to revocations, which may occur if the arrested/suspended driver is convicted, very few drivers are ever revoked due to the disposition of the criminal charges. Indeed, since the beginning of 2023 no more than five TLC drivers have had their licenses revoked based on that basis. Such revocations are unusual despite the fact that TLC Rule 68-14(a) permits a revocation for "any conviction" of the same charges, including misdemeanors, for which the TLC automatically suspends.

obstruction of breathing or blood circulation and related charges, all misdemeanors or non-criminal violations.

55.    The TLC conducted no review of Mr. Pena's record or investigation of the charges before ordering his suspension. The suspension was based solely on his arrest. But The TLC did offer him the option of a post-suspension hearing, which Mr. Pena— having no other way to promptly have his license reinstated and his livelihood restored— requested on April 9.

56.    Mr. Pena retained counsel to represent him at the hearing.

57.    In fact, this was Pena's first arrest and it was for an off-duty incident between Mr. Pena and his girlfriend having nothing to do with driving a taxi. The police report indicated that complainant, Mr. Pena's ex-girlfriend, was "physically injured" with an "apparent minor injury" and was treated at the scene.

58.    Mr. Pena's Uber and Lyft ratings were at the time 4.98 and 4.99, respectively, out of five stars, which the TLC could have known.  It also could have known that he completed approximately 1,650 fares a year and had not threatened or attempted to injure a passenger or received any passenger complaints that he assaulted or threatened to assault a passenger.

59.    The TLC, even at the hearing, did not introduce any evidence of any prior license suspensions, traffic or TLC rule violations, or criminal convictions— all of which the TLC knew or could have known prior to suspending Mr. Pena's license. The TLC called no witnesses, but relied instead on the documents referenced in paragraph 41, above.

60.    After a hearing on April 15, the OATH ALJ recommended that Mr. Pena's suspension be lifted, saying that the arrest was for a single incident which police reports indicated resulted in an "apparent minor injury" to a complainant who did not testify to any injury caused by respondent and who denied that respondent had ever hurt her. The ALJ also

noted that there was no evidence that the arraignment court issued even a limited order of protection, and its referral of the case to an alternative/problem-solving court suggests that, rather than considering respondent as presenting a risk to the complainant's safety, it viewed him as capable of exercising self-control.

61.     The TLC called no witnesses and offered no evidence in support of the criminal allegations, which Mr. Pena denied.

62.     Thus the ALJ concluded that the TLC had failed to establish that Mr. Pena's continued licensure pending the outcome of his criminal case poses a direct and substantial threat to public health or safety.

63.     Despite this overwhelming evidence—all or most of which was available to the TLC before the suspension— the TLC chair did not lift Mr. Pena's suspension until May 1. Thus his license was suspended for 33 days.

**Ariful Islam**

64.     The TLC suspended Ariful Islam's license on November 2, 2023 after being notified that he was arrested on or about November 1 for misdemeanor assault and harassment. The charges resulted from an altercation between Mr. Islam and his father, which, according to Mr. Islam's sworn testimony, started when he went to his mother's defense.

65.     Before ordering his suspension, The TLC conducted no review of the underlying charges or the incident that led to Mr. Islam's arrest or of his record. The suspension was based solely on the fact of his arrest. Had the TLC conducted even cursory review, it could have learned that there was no allegation that Mr. Islam possessed a weapon; there were no injuries and the alleged victim neither sought nor received medical attention.

66.     The TLC did offer Mr. Islam the option of a post-suspension hearing, which Mr. Ali accepted a hearing on or about November 3 as he was eager to have his licenses and his livelihood reinstated.

67.     Mr. Islam is a college graduate, who had no prior arrests.

68.     Mr. Islam had worked as a taxi driver for five years and his TLC license had never been previously suspended. He had never been accused of assaulting or threatening a passenger. Nor did he have any serious driving violations on his record. All of this information was available to the TLC prior to his suspension.

69.     Mr. Islam retained counsel to represent him at the hearing.

70.     The TLC, even at the hearing held on November 21, did not call any witnesses and did not introduce any evidence of any prior license suspensions, traffic or TLC rule violations, or criminal convictions. It did not introduce a police report. Instead, it relied on a criminal court complaint signed on November 1, 2023, by a police officer who summarized the complainant's claims.

71.     After the hearing, the OATH ALJ recommended Mr. Islam's reinstatement. The ALJ noted that Mr. Islam is a hard-working licensee who has safely served passengers without ever receiving a complaint. He has an unblemished driving record that appeared to be an isolated incident in an otherwise law-abiding life.

72.     Despite this overwhelming evidence—much of which was available to the TLC before the suspension— the TLC chair did not lift Mr. Islam's suspension until November 29. Thus Mr. Islam's license was suspended for 28 days.

**Daereon Friday**

73.      The TLC suspended Daereon Friday's TLC license on September 22, 2023 after being notified that he was arrested the day before on charges of reckless endangerment, reckless driving and NY Vehicle and Traffic Law violations, all misdemeanors or non-criminal violations.

74.      The TLC conducted no review of Mr. Friday's record or investigation of the charges before ordering his suspension. The suspension was instead based solely on his arrests.

75.      The TLC did offer him the option of a post-suspension hearing, which Mr. Friday— having no other way to promptly restore his licenses and his livelihood— requested a hearing on or around September 25.

76.      In fact, this was Mr. Friday's first arrest and it was for an off-duty traffic accident at which Mr. Friday has swerved to avoid a scooter driver and hit a parked car and which resulted in no injuries and after which Mr. Friday stayed at the scene.

77.      As the TLC knew or could have known, Mr. Friday had been a taxi driver for two years, driving a wheelchair-accessible vehicle and had a Uber rating of 4.91 out of five stars . It also could have known that he had served approximately 7,000 Uber and 600 Access-A-Ride passengers, and he had never received a passenger complaint.

78.      Mr. Friday retained counsel to represent him at the hearing.

79.      The TLC, even at the hearing,  did not introduce any evidence of any prior license suspensions, traffic or TLC rule violations, or criminal convictions— all of which the TLC knew or could have known prior to suspending Mr. Friday's license.

80.    After a hearing on October 5, the OATH ALJ recommended that Mr. Friday's suspension be lifted as the TLC had failed to demonstrate that his licensure posed a direct and substantial threat to public safety.

81.    The ALJ concluded, "The evidence showed that respondent is a hard-working licensee who has safely served thousands of passengers without ever receiving a complaint. He has an unblemished driving record and the arrest stems from an accident where nobody was hurt. It appears to be an isolated incident in an otherwise law-abiding life.

82.    Despite this overwhelming evidence—all or most of which was available to the TLC before the suspension— the TLC chair did not lift Mr. Friday's suspension until October 20. Thus his license was suspended and he lost his livelihood for 29 days.

### Shaukat Ali

83.    The TLC suspended Shaukat Ali's license on July 5, 2024 after being notified that he was arrested on or about July 3 for assault, a misdemeanor, and harassment, a non-criminal violation, all charges arising from an alleged physical altercation between Mr. Ali and his wife of 26 years.

84.    The TLC conducted no review of the underlying charges or the incident that led to Mr. Ali's arrest or of his record before ordering his suspension. The suspension was based solely on the fact of his arrest.

85.    The TLC did offer Mr. Ali the option of a post-suspension hearing, which Mr. Ali requested on or about July 9 in order to promptly have his licenses and his livelihood reinstated.

86.    Mr. Ali had no prior arrests. Moreover, Mr. Ali had worked as a TLC licensed driver for nine years and his TLC license had never been previously suspended. Nor did he have any serious driving violations on his record. At the time of his arrest, he had near perfect

passenger ratings and has never received any passenger complaints regarding his conduct as a driver.

87.    Mr. Ali, as the TLC could have known, had worked as a taxi driver for nine years and had completed about 22,500 fares. He had not threatened or attempted to injure a passenger. He also had not received any passenger complaints that he had assaulted or threatened to assault a passenger.

88.    Mr. Ali retained counsel to represent him at the hearing.

89.    The TLC, even at the hearing which was held on July 17, did not call any witnesses and did not introduce any evidence of any prior license suspensions, traffic or TLC rule violations, or criminal convictions.

90.    After a hearing, the OATH ALJ recommended that Mr. Ali's suspension be lifted, concluding that the TLC had failed to establish that Mr. Ali's continued licensure pending the outcome of his criminal case poses a direct and substantial threat to public health or safety. The OATH ALJ summarized the evidence, saying, that the record "reflects that this was an isolated incident in respondent's otherwise law-abiding life" and that "There [was] no evidence of prior incidents of domestic violence between respondent and his wife. The relevant parts of the New York Police Department complaint report [had been] redacted and respondent's testimony that he has never engaged in any physical confrontation with his wife was unrebutted

91.    Despite this overwhelming evidence—all or most of which was available to the TLC before the suspension— the TLC chair did not lift Mr. Ali's suspension until July 24. Thus Mr. Ali's license was suspended for 20 days.

## FIRST CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

92.     The preceding paragraphs are hereby incorporated by reference.

93.     Defendants summarily suspended Plaintiffs' licenses and means of livelihood based solely on arrests, causing Plaintiffs to request hearings.

94.     Defendants had no probable cause to believe that Plaintiff drivers' licensures presented a direct and substantial threat to public safety.

95.     These hearing had the attributes of a criminal prosecution.

96.     Defendants pursued the prosecutions with malice.

97.     These administrative prosecutions  were terminated in Plaintiffs favor when the OATH ALJs found that Defendants had failed to demonstrate that Plaintiffs' licensure posed a direct and substantial threat to public safety.

98.     Defendants commenced Plaintiffs' prosecutions by filing a petition based simply on the fact of there being pending misdemeanor charges and pursued those prosecutions without obtaining or even seeking evidence that their licensure presented a direct and substantial threat to public safety.

99.     There was no probable cause for instituting the civil proceedings against Plaintiffs, which defendants knew or easily could have known including by reviewing the TLC's own filed..

100.    These prosecutions caused Plaintiffs substantial damages.

## SECOND CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER NEW YORK LAW

101.    The preceding paragraphs are hereby incorporated by reference.

102.    Defendants caused Plaintiffs to request hearings by summarily suspending their licenses and their means of livelihood.

103.    Defendants commenced Plaintiffs' prosecution by filing a petition based simply on the fact of arrest and pursued those prosecutions without obtaining or even seeking evidence that their licensure presented a direct and substantial threat to public safety.

104.    There was no probable cause for instituting the civil proceedings against Plaintiffs, which defendants knew or easily could have known including by reviewing the TLC's own filed.

105.    Defendants persisted in these civil prosecutions with malice

106.    These prosecutions caused Plaintiffs substantial damages.

## THIRD CLAIM FOR RELIEF
## UNLAWFUL SUPENSIONS

107.    The preceding paragraphs are hereby incorporated by reference.

108.    Defendants suspended Plaintiffs' TLC licenses in violation of TLC rules and without authority from New York because they did so without evidence or belief that their licensure presented a direct and substantial threat to public safety.

109.    These prosecutions caused Plaintiffs substantial damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs ask this Court:

A.  To enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b) for the Plaintiffs' class described herein and naming plaintiffs as the class representatives.

B.  To enter a judgment declaring that Defendants' policy, practice and custom summarily suspending TLC driver licenses based on mere allegations of wrongdoing is unconstitutional.

C.  To enter a judgment declaring that defendants' policy and practice of summarily suspending TLC driver licenses based on mere allegations of wrongdoing is illegal under state law.

D.  To enter a judgment declaring that defendants' hearing procedures are in violation of state law.

E.  To issue an order enjoining defendants' policy, practice and custom of summarily suspending TLC driver licenses based solely on the pendency of criminal charges

F.  To award the named Plaintiffs and members of the class compensatory damages in an amount to be determined at trial.

G.   To award the named Plaintiffs and members of the class punitive damages in an amount to be determined at trial.

H. To award the named Plaintiffs and members of the class reasonable attorney's fees and costs.

I.  To grant such other and further relief as this Court shall find just and proper.

Dated: New York, New York
August __, 2024

Daniel L. Ackman (DA-0103)
26 Broadway, 8th Floor
New York, NY 10004
(917) 282-8178
d.ackman@comcast.net

Attorney for Plaintiffs